# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1235
_____

Kyle Allen Rusness

*Plaintiff - Appellant*

v.

Becker County, Minnesota, and its Personnel; Vivian Anderson; Josie Johnson

*Defendants - Appellees*

Jane Doe

*Defendant*

Matthew H. Johnson; John Freeman, acting in their individual capacities; Michele Clayson, acting in her individual capacities; Todd Glander, acting in his individual and official capacities; Paula Peterson, acting in her individual and official capacities

*Defendants - Appellees*

Teresa Ullmer

*Defendant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: December 16, 2021
Filed: April 12, 2022

_____

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.

_____

SMITH, Chief Judge.

Kyle Rusness arrived at Becker County Jail in Minnesota with a number of physical ailments. Two weeks later, he was taken to the hospital and subsequently diagnosed with acute myeloid leukemia. Rusness underwent successful cancer treatment. His cancer has gone into remission, but he continues to suffer from multiple lasting side effects. He filed an action against Becker County and its personnel, claiming deliberate indifference to his medical needs, failure to provide adequate training and supervision to corrections officers, and negligence. The district court[1] granted summary judgment in favor of the defendants. The court held that they were entitled to qualified immunity on the deliberate indifference claim and that Rusness had failed to present sufficient evidence of negligence and of failure to train or supervise. We affirm.

## I. *Background*
### A. *Facts*

In December 2014, Rusness was arrested for driving violations and incarcerated in Rigby, North Dakota. On January 6, 2015, while still incarcerated, a doctor diagnosed him with an infection on his leg. Rusness had already been taking penicillin for a dental infection. The doctor discontinued the penicillin prescription and instead prescribed another antibiotic, Bactrim, for both infections.

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

Ten days later, on January 17, Rusness was transferred to Becker County Jail (BCJ) in Minnesota to be held as a pretrial detainee. On January 23, he was convicted of a probation violation and began serving his sentence. His intake form listed his medical concerns as: (1) MRSA (staph infection), (2) an infection in the mouth, (3) a body rash, and (4) cardiac issues. The form also noted that he was taking Bactrim. Shortly after his arrival at BCJ, Rusness submitted a Sick Call Request detailing his symptoms, including fatigue, dizziness, cardiac pain, night sweats, blurred vision, and bleeding gums.

During the relevant period, Sunnyside Care Center (Sunnyside) provided nursing services at BCJ. Two Sunnyside nurses, Teresa Ullmer and Tami Sweep, served BCJ inmates. One or the other would be available on-site at BCJ two to three days per week. Sunnyside nurses were also available by phone 24 hours a day.

On Monday, January 19, two days after Rusness's arrival, Nurse Ullmer attempted to see Rusness pursuant to his Sick Call Request. However, Rusness declined to see her. The following day, January 20, Officer Paula Peterson wrote an Incident Report noting Rusness's Sick Call Request, his refusal to see the nurse, and his Bactrim prescription.

Rusness submitted another Sick Call Request the next day, January 21, complaining of a headache, fever, vomiting, and "gums [that] look[ed] really bad," noting that his rash had cleared and requesting to see a doctor. R. Doc. 73-1, at 28. He agreed to see Nurse Sweep. Nurse Sweep visited Rusness and noted his complaints. She also described his appetite, temperature, blood pressure, and pulse as normal. She scheduled a dental appointment for him for February 4.

That Friday, January 23, he submitted a third Sick Call Request seeking a higher dose of ibuprofen for "very severe" mouth pain. *Id.* at 30. The next day, Saturday, January 24, Rusness spoke with Officer Peterson as she distributed

medications. He asked her to look at a sore on his upper thigh. Officer Peterson told Rusness that a male corrections officer would need to examine the sore because of its location. She contacted Officers Vivian Anderson and John Freeman and asked them to check on Rusness. The officers met with Rusness, and Officer Freeman examined the sore. They decided to take him to the nearby Essentia Health walk-in medical clinic. Officer Freeman accompanied Rusness to the clinic. There, Rusness told the physician's assistant (PA), Vonda Eidenschink, who examined him about his various symptoms, including his bleeding gums. PA Eidenschink diagnosed him with gingivitis and a skin infection and prescribed him another antibiotic, Clindamycin, for his skin infection and an oral rinse to treat his gingivitis until his upcoming dental appointment. She also noted that Rusness had a number of additional concerns and recommended he receive a full physical exam by a family practice physician. She wrote her instructions on an Inmate Medical Report, which Officer Freeman placed in the nurses' inbox at BCJ. Officer Peterson wrote an Incident Report documenting Rusness's complaints and his visit to the clinic.

The next day, January 25, Officer Christopher Burton filled out a Sick Call Request for Rusness. The request asserted that his symptoms were getting worse. Rusness submitted an additional Sick Call Request later in the day reporting that his throat was closing and that he was unable to gargle the prescribed oral rinse and had difficulty eating and drinking. He also requested a doctor's appointment. Later that day, Rusness's aunt visited. He told her, "I think it's serious, that's—they think it's serious. You know, [certain jailers] come and check on me all the time, make sure I'm doing okay. And they have sympathy, they're waiting for somebody to let me go see a medical physician." R. Doc. 60-1, at 19.

On Monday, January 26, Nurse Ullmer reviewed Rusness's Sick Call Requests and Inmate Medical Report. She did not, however, have access to PA Eidenschink's examination note. Consequently, although she knew Rusness had visited the medical clinic and received prescriptions, she did not know of his gingivitis and skin infection

-4-

diagnoses. When Nurse Ullmer saw Rusness that day, she took down his complaints, including bleeding from the nose and mouth, vomiting, and seeing a "blood spot" in his eye when looking into the light. *Id.* at 97. Rusness told her that he could barely talk, but he spoke loquaciously, forcing her to interrupt him to complete her questions. She did not examine his nose or mouth during the visit. Rusness also repeatedly told Nurse Ullmer that he needed to go to the emergency room.

Afterwards, she scheduled an appointment for Rusness to see a family practice physician per PA Eidenschink's instructions for February 3, eight days later. She made Tylenol available to Rusness as needed. She wrote in the Nurse Logbook that he was continuing his antibiotic and mouth rinse and that she had scheduled a doctor's appointment for him. She instructed BCJ staff to report if Rusness was bleeding or vomiting.

Nurse Ullmer relayed this information to Officer Peterson, who wrote an Incident Report, which states, "The nurse does have some concerns but until [Rusness] is on the antibiotic for longer and the antibiotic starts working there is no reason for a follow-up with a doctor." R. Doc. 73-1, at 53 (all caps omitted). Nurse Ullmer testified at her deposition that she believed that Rusness had "no current symptoms that would trigger following up with a doctor at [this] time." R. Doc. 73-1, at 21.

The following day, January 27, Officer Josie Johnson spoke with Rusness as she delivered medication. Rusness declined his pain medication. She noted seeing some watered-down blood near Rusness. Having reviewed the Nurse Logbook prior to distributing medications, Officer Johnson did not believe that Rusness's condition was serious. However, she was concerned about the potential biohazard posed by the blood and called Officer Freeman to Rusness's cell.

After arriving, Officer Freeman noticed blood on Rusness's sheets as well as on the wall. He also saw bloody saliva in a cup on the floor. He reported the situation to Officer Anderson, the supervisor on duty, who also looked at Rusness's cell and had Officer Freeman take photographs of it. Then Officers Freeman and Anderson took Rusness in a wheelchair to a medical observation cell, where he could be monitored by camera. Officer Freeman took Rusness's temperature, which measured 99.9 degrees, a low-grade fever. Jail staff, including Officers Freeman and Anderson, monitored Rusness by video feed and performed well-being checks every 30 minutes. Rusness's temperature remained at 99.9 degrees when it was later checked. Officer Anderson also observed blood-tinged drool once while Rusness was sleeping.

During this monitoring period, Officer Anderson reviewed Rusness's file in the Nurse Logbook. From the file, she learned that (1) he recently had been to the clinic and given medical clearance to return to BCJ; (2) Nurse Ullmer had seen him the day before and concluded that his symptoms did not warrant another visit to the clinic; (3) Nurse Ullmer believed his antibiotic would need some additional time to start working; and (4) Nurse Ullmer anticipated that Rusness might experience additional bleeding and vomiting, which should be documented and reported. Officer Anderson also recalled learning from another officer that Rusness had been diagnosed with gingivitis at his clinic visit and had been prescribed an antibiotic and mouth rinse as treatment.

As there was no nurse on duty at BCJ at this time, Officer Anderson contacted the on-call nurse at Sunnyside for further guidance. The Sunnyside nurse instructed BCJ staff to continue monitoring Rusness. In compliance with Nurse Ullmer's logbook instruction to report any bleeding, Officer Freeman wrote a note about the incident and put it on a desk in the nurses' office. Despite the call and the note, Nurse Ullmer testified that she was not made aware of the January 27 incident.

The following day, January 28, Rusness was moved out of medical observation. His aunt visited him that evening. Rusness told her about the bleeding incident, explaining that he did not know how it started or how the blood had gotten in his cell and that he "barely remembered what happened." R. Doc. 60-1, at 33. At his deposition, he testified that he still does not remember much about the incident. For the next few days, Rusness reported no additional bleeding and continued with his prescribed medications.

On January 31, Officer Freeman spoke with Rusness while distributing medications. Rusness called out from his bed, asking for his medication. Officer Freeman told him to come to the cart. Rusness then crawled 10 to 15 feet to the medication cart. Once at the cart, Rusness stood up, took his medication, and walked normally back to his bed.

On February 1, Rusness told Officer Michele Clayson that his leg was numb and that his arm had been numb earlier. Officer Clayson, however, observed that Rusness was walking normally and did not appear to be in distress. Officer Clayson advised him to fill out a Sick Call Request. Rusness told her that his symptoms were worsening and that he had discontinued his antibiotic because it was causing him to vomit. He also stated that he had not left bed in a week and was experiencing great pain. Rusness also discussed his condition during a visit with his aunt later that day, telling her that his bleeding was improving but his fatigue was worsening. He also informed her of his upcoming medical and dental appointments.

That day, Rusness submitted another Sick Call Request, reporting that all his symptoms were worsening. He reported feeling fatigue and experiencing additional bleeding. Officer Peterson later filed an Incident Report regarding Rusness's Sick Call Request and his having discontinued his antibiotic. Nurse Ullmer met with him the following day, February 2. She saw no bleeding. Rusness's temperature was slightly elevated at an even 100.00 degrees. Nurse Ullmer then called the dentist with

whom Rusness had an upcoming appointment for guidance. The dentist told her that the bleeding could have several causes, including Rusness's use of methamphetamine, his extended time on antibiotics, a wisdom tooth issue, or a general body infection. The dentist instructed Nurse Ullmer that Rusness should continue his medications as prescribed, but, if he experienced any swelling of the face or elevated temperature, then the jail should arrange for him to see a doctor. Nurse Ullmer wrote an entry in the logbook informing BCJ staff that if Rusness's temperature rose above 100.00 degrees, it should be reported. However, she did not instruct staff to take him to a doctor. Later that day, Officer Matthew Johnson moved Rusness to a medical observation cell.

On the morning of February 2, Officer Freeman decided to take Rusness to the emergency room at Essentia hospital based on his condition at the time. While waiting for the car to transport him to the hospital, Officer Freeman noticed Rusness had difficulty walking and actually fell twice before getting into the car.

At the hospital, the ER physicians performed blood tests and a CT scan. They diagnosed him with severe anemia, thrombocytopenia, and a subarachnoid hemorrhage, and they transferred him via airlift to Sanford Medical Center in Fargo, North Dakota. Two more CT scans revealed additional subarachnoid hemorrhaging at "multifocal regions of both cerebrum." R. Doc. 73-1, at 129. Ultimately, doctors diagnosed him with acute myeloid leukemia. He spent approximately three weeks in the hospital receiving treatment. His leukemia went into remission in March 2018. However, he continues to suffer from two permanent conditions: clouding in his peripheral vision and post-traumatic stress disorder.

B. *Procedural History*

Relevant to this appeal, Rusness filed an amended complaint on September 6, 2019, under 42 U.S.C. § 1983. He alleged that the individual defendants, through deliberate indifference, violated his rights under the Eighth and Fourteenth

Amendments to the United States Constitution. He also asserted claims against Becker County under *Monell*[2] for failure to provide adequate training to corrections officers; enacting unconstitutional policies, customs, and practices; and failure to provide adequate supervision of corrections officers. Additionally, he brought a state-law negligence claim against Becker County, Nurse Ullmer, and Officers Peterson, Anderson, Matthew Johnson, Josie Johnson, Clayson, Freeman, and Todd Glander.

On August 15, 2020, the defendants filed a motion for summary judgment, seeking dismissal of the claims against them.[3] On January 7, 2021, the district court issued an order granting the defendants' motion for summary judgment. The court determined that the individual defendants were entitled to qualified immunity against Rusness's deliberate indifference claim. The court held that the rights that Rusness sought to enforce were not clearly established under existing precedent. The court also concluded that Rusness had failed to put forth sufficient evidence to support his supervisory liability claim against Officer Glander and that Officer Peterson could not be held liable on a theory of supervisory liability because she was not a supervisor when the events transpired. The court also concluded that Becker County was entitled to summary judgment on Rusness's *Monell* claims because he had not put forth evidence that Becker County was on notice that any of its training procedures were inadequate or that its officials had engaged in misconduct. Finally, the court determined that Rusness had not provided sufficient evidence to support his negligence claim or to overcome defendants' assertion that their actions were protected by official immunity. Judgment was entered in favor of defendants on January 8, 2021.

---

[2] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

[3] Rusness settled his claims against Nurse Ullmer on October 21, 2020.

## II. *Discussion*

"We review the district court's grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in the light most favorable to [the nonmoving party]." *Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To show a genuine dispute of material fact, a party must provide more than conjecture and speculation. Rather the nonmovant has an affirmative burden to designate specific facts creating a triable controversy." *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019) (cleaned up). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### A. *Deliberate Indifference*

Rusness claims that members of BCJ staff were deliberately indifferent to his medical needs in violation of the Eighth and Fourteenth Amendments. In general, a government official's deliberate indifference to an inmate's medical needs violates the inmate's constitutional rights. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Prison personnel, like corrections officers, without medical training demonstrate deliberate indifference by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* (footnotes omitted). Proof of deliberate indifference requires that an inmate show the following: "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019) (quoting *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004)).

Qualified immunity "shields government officials from liability when their conduct does not violate clearly established constitutional rights of which a

reasonable person would have known." *Ivey v. Audrain Cnty.*, 968 F.3d 845, 848 (8th Cir. 2020) (quoting *Thiel v. Korte*, 954 F.3d 1125, 1128 (8th Cir. 2020)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).

Qualified immunity analysis involves two inquiries: (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts have liberty to choose the order of addressing the inquiries. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Showing that a right was clearly established requires identifying controlling precedent with a close correspondence to the particulars of the present case. *Anderson v. Creighton*, 483 U.S. 635, 639–41 (1987); *Mullenix*, 577 U.S. at 12 (stating that the analysis requires considering the "*particular* conduct" and the "specific context" (internal quotation marks omitted)). This means that the right in question must be construed fairly narrowly and that facts in the present case must align with facts in precedent. *See Ivey*, 968 F.3d at 849 (reversing the district court for defining the right at issue too broadly). In effect, this standard requires a close examination of the facts to determine what right is at issue and thus whether qualified immunity is appropriate.

On appeal, Rusness argues that the district court erred in two respects in its qualified immunity analysis: first, he argues that the court ignored a dispute of material fact involving Officer Anderson's January 27, 2015 call to Sunnyside nursing staff; second, he argues that the court erroneously found that the right at issue was not clearly established.

On January 26, 2015, Nurse Ullmer instructed BCJ staff to report any further bleeding and vomiting that Rusness might experience. The next day, Rusness again experienced bleeding. Officer Anderson testified in her deposition that Rusness experienced these symptoms when there was no nurse on duty. She, therefore, either called or had another staff member call Sunnyside which had nurses available by phone around the clock. Nurse Ullmer, however, testified that she was never made aware of this incident.

Rusness argues that whether his condition was reported to medical personnel on this occasion is a material fact. He contends that the discrepancy between the accounts of Officer Anderson and Nurse Ullmer, along with the absence of documentation confirming that the call was made, puts the call's existence in dispute and that the district court should therefore be reversed. We disagree. Assuming that Rusness raised a genuine factual dispute, we conclude that it was immaterial. *See Dardanelle*, 928 F.3d at 725 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." (internal quotation marks omitted)). The undisputed facts show that Officers Freeman and Johnson wrote reports about the bleeding incident, which were placed in the nurses' inbox at BCJ. These reports establish that jail staff complied with Nurse Ullmer's orders to report further incidents. As to Officer Anderson, her negligence does not constitute the kind of "unnecessary and wanton infliction of pain" that would amount to deliberate indifference; nor would it suffice to overcome the evidence establishing her continued attentiveness to Rusness's condition. *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Therefore, Rusness's first argument fails. No material fact is in dispute.

On the basis of the undisputed facts, we conclude that no violation of the Eighth or the Fourteenth Amendments occurred. The instant undisputed facts do not provide sufficient proof that the defendants acted with deliberate indifference to

Rusness's medical needs. The facts do not show intentional denial or delay in access to medical care nor any interference with the treatment provided.

The threshold question is whether Rusness manifested signs of a serious medical need that would be sufficiently obvious to jail staff without medical training. *See Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482–83 (8th Cir. 2008). In *Jones*, we confronted the same question. The inmate in *Jones* "was unable to stand or walk under her own power, was 'google-eyed' and unresponsive, was rolling on the ground while grunting and groaning, [had dried blood and cuts on her lips], smelled as if she had urinated on herself, and was breathing at a very rapid rate." *Id.* at 482 (footnote omitted). Later, she was found unresponsive in her cell, having died of a pulmonary edema. *Id.* at 481. Her underlying condition, however, only became evident after her autopsy. *Id.* We declined to hold that prison officials violated her constitutional rights, reasoning that "[t]he question here. . . is not, in hindsight, whether Jones had a serious medical condition, but rather, whether the condition was so obvious that a layperson would have easily recognized the need for medical treatment." *Id.* at 483.

Rusness's symptoms were not as severe as those experienced by the inmate in *Jones. Compare id.*, *with Roberson v. Bradshaw*, 198 F.3d 645, 647–48 (8th Cir. 1999) (serious medical need obvious to laymen when inmate experienced excessive urination, diarrhea, sweating, weight loss, and dehydration related to *known* diabetes diagnosis), *and Hartsfield*, 371 F.3d at 457 (holding serious medical need obvious to laymen where inmate had swollen and bleeding gums and complained of extreme tooth pain). Like the inmate in *Jones*, Rusness's most serious underlying conditions, severe anemia and leukemia, were unknown to jail staff while he was under their supervision. To the extent that he complained of pain, Rusness gave mixed signals as to its severity: (1) he refused to take his medication, including medication for his pain; (2) asserted having difficulty speaking, yet spoke extensively; and (3) on two occasions, complained that he was unable to walk and then proceeded to do so. Unlike *Jones*, however, Rusness's symptoms were connected to prior diagnoses—not

of leukemia, but of far less serious conditions like gingivitis. In other words, if medical professionals failed to grasp the seriousness of his condition, prison staff without medical training could not have been expected to do so.

We also note that Nurse Ullmer's instructions to staff included guidance that the antibiotics prescribed for his known conditions should be allowed time to show results. And moreover, all of the events of late January 2015 immediately preceded a scheduled doctor's appointment on February 3. The actions of BCJ staff reflect efforts to comply with Nurse Ullmer's orders and render care to Rusness.

Rusness points to *Foulks v. Cole County*, 991 F.2d 454 (8th Cir. 1993), to support his position that it should have been obvious to laymen that he suffered from a serious medical need that was not being addressed. There, the inmate had been taken to the hospital after being severely beaten. *Id.* at 455. When he left the hospital in custody, a doctor provided police with written instructions for police to monitor his head injury. *Id.* Once in jail, the inmate reported feeling sick and vomiting blood. *Id.* at 456. The next day, his mother, a nurse, spoke to him on the phone and noticed that he slurred his speech. *Id.* She asked to see him or for him to be allowed to see a doctor at her expense, telling staff that she was concerned he may have had a head injury. *Id.* Staff denied both requests, despite jail policy permitting inmates to see physicians at their own expense. *Id.* Ultimately, his head injury required him to have surgery to remove a portion of his brain, leaving him permanently impaired. *Id.*

*Foulks* is inapposite. Here, rather than ignore sound medical judgment, the defendants attempted to follow the instructions they received from the nurse. Rusness repeatedly saw medical professionals, and jail staff monitored his condition. Far from refusing him treatment, BCJ staff attempted to care for his known conditions according to guidance from medical professionals.

-14-

Rusness suffered from leukemia, undoubtedly an objectively serious condition. But that condition was unknown to staff. A PA examined Rusness, diagnosed him with gingivitis and a leg infection, and prescribed treatment, which Nurse Ullmer told staff would take time to work. Here, unlike in *Foulks*, the jail staff had no basis for concluding that the instructions they received were so ineffective that following them might raise the specter of liability for deliberate indifference to an inmate's medical need.

The district court did not err in concluding that Rusness failed to show that the prison guards violated his rights protected by the Eighth and Fourteenth Amendments of the Constitution when they failed to recognize the seriousness of an underlying medical condition that repeatedly eluded trained medical professionals. *See Roberts v. Kopel*, 917 F.3d 1039, 1043 (8th Cir. 2019) ("It is well-established that, '[i]f trained health care officials could not find a serious medical need in these circumstances, then we decline to hold that a reasonable lay person should have done so.'" (alteration in original) (quoting *Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir. 1995))). The defendants are therefore entitled to qualified immunity as to Rusness's deliberate indifference claim.

## B. *Monell Claims*

A municipality can be sued directly under 42 U.S.C. § 1983. *Monell*, 436 U.S. at 690. "[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Hence, the existence of a constitutional violation is a threshold issue for a *Monell* claim to move forward. As the discussion in the preceding section demonstrates, Rusness's constitutional rights were not violated. *See Roberts*, 917 F.3d at 1042–43; *Jones*, 512 F.3d 482–83. His *Monell* claims thus also fail.

## C. *Negligence*

Rusness also brings a negligence claim under Minnesota state law. To establish negligence, Rusness must show that (1) the defendants owed him a duty of care, (2) the defendants breached the duty of care, and (3) the breach caused him to suffer an injury. *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995). Jailers owe an affirmative duty of care to detainees and inmates. *Sandborg v. Blue Earth Cnty.*, 615 N.W.2d 61, 64 (Minn. 2000).

Appellees argue that Minnesota law entitles them to official immunity and that Rusness did not provide sufficient evidence of this claim to survive summary judgment. Official immunity shields government officials from claims that arise from officials' discretionary, as opposed to ministerial, actions. *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990). "A discretionary act is one for which an official must exercise 'judgment or discretion,'" while "[a] ministerial act involves merely the execution of a specific, absolute duty." *Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (first quoting *Johnson v. State*, 553 N.W.2d 40, 46 (Minn. 1996), then citing *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998)). Immunity will not however shield an official who "commit[s] a willful or malicious wrong." *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 679 (Minn. 1988).

Rusness argues that defendants violated three separate ministerial duties: first, a duty to document Rusness's medical problems and complaints during the course of his incarceration; second, a duty to go over his file to discover "any potential medical problems"; third, a duty "to respond to his requests for pain treatment and medical attention." Appellant's Br. at 45.

The district court conceded that the duties to document medical problems and review his file may be ministerial, but it concluded that, nonetheless, Rusness had failed to present evidence sufficient for his claim to survive summary judgment. We agree. Rusness contends that had the appellees read his file, "it is likely that they

would have discovered, among other things, the Sick Request Call forms Rusness had submitted from the very beginning of his custody period[] and would have been more aware of his deteriorating and serious medical condition." R. Doc. 74, at 34. However, even assuming that appellees breached a duty to document and review his medical complaints, Rusness fails to show that this caused his injury. Rusness presents no evidence that better attentiveness to documentation would have made appellees aware of the seriousness of his medical issues, such that they would have taken him to a doctor sooner. After all, appellees, not themselves physicians or nurses, were acting according to the advice of medical practitioners, who themselves failed to grasp the source and full extent of Rusness's medical issues. Additionally, the evidence demonstrates that Officer Anderson reviewed his file, yet she still chose not to take him to the hospital.

The third responsibility that Rusness discusses is not properly understood as a ministerial duty but rather as a discretionary function. An inmate's requests for pain treatment and medical attention require an officer to exercise "judgment or discretion" as to how best to respond given the necessarily unique circumstances. *Johnson*, 453 N.W.2d at 41. There is moreover no evidence that appellees were malicious in their responses to Rusness's requests. *See Elwood*, 423 N.W.2d at 677. The actions of the individual appellees in response to Rusness's request for medical attention are thus subject to official immunity. Because the individual appellees are entitled to official immunity, Becker County is entitled to the same immunity vicariously. *See Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 508 (Minn. 2006).

III. *Conclusion*

Accordingly, we affirm the district court.

_____

-17-