# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-2691

_____

Jennifer Harmon, individually and as surviving mother of N.J. and on behalf of the
Class of Persons Designated by R.S. MO Section 537.080

*Plaintiff - Appellant*

v.

Preferred Family Healthcare, Inc.

*Defendant*

Second Judicial Circuit of the State of Missouri; Jeff Hall, individually, and in his
individual capacity; Westley Seifert, individually, and in his individual capacity;
Misty Goings, individually, and in her individual capacity; Frank Vorhees,
individually, and in his individual capacity; Patrick Williams, individually, and in
his individual capacity; Jessica Morrow, individually, and in her individual
capacity; Richard Love, individually, and in his individual capacity, also known as
Bronson Love; Diana Shields, individually, and in her individual capacity; Daniel
Kennedy, individually, and in his individual capacity; Rachel Van Beers,
individually, and in her individual capacity; Lisa Wassenhove, individually, and in
her individual capacity; Betty Robertson, individually, and in her individual
capacity; Michelle L. Govro, individually, and in her individual capacity

*Defendants - Appellees*

Tracy Francis, individually, and in her individual capacity

*Defendant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Hannibal
_____

Submitted: September 25, 2024
Filed: January 13, 2025
_____

Before SMITH, ERICKSON, and STRAS, Circuit Judges.
_____

SMITH, Circuit Judge.

Jennifer Harmon's son tragically died by suicide while he was a resident of the Bruce Normile Juvenile Justice Center (BNJJC) and in the care of the Second Judicial Circuit of Missouri (Second Circuit). Harmon filed suit seeking damages for her son's death, which included nine counts of various 42 U.S.C § 1983 and state wrongful death claims against the Second Circuit, several named defendants from both the Second Circuit and BNJJC (Government Defendants), Preferred Family Healthcare (PFH), and several named defendants from Preferred Family Healthcare (PFH Defendants). All defendants filed motions to dismiss for failure to state a claim. The district court[1] granted the Second Circuit and Government Defendants' motion to dismiss because (1) the claims against the Second Circuit were barred by the Eleventh Amendment, (2) the § 1983 claims against the Government Defendants were barred by qualified immunity, and (3) the state tort claims against the Government Defendants were barred by official immunity. Harmon appeals those immunity judgments. We affirm.

I. *Background*

Harmon's minor son, N.J., suffered from severe mental illness. On February 8, 2018, N.J. was hospitalized for suicidal ideation, and while in the psychiatric unit,

_____

[1]The Honorable Sarah E. Pitlyk, United States District Judge for the Eastern District of Missouri.

-2-

he threatened to hang himself and admitted to giving himself tattoos that he would pick off later. N.J. was discharged a week later on February 15.

In late February, N.J. was placed in protective custody of the Missouri Department of Social Services, Children's Division. That day, he entered BNJJC where he was placed in the care of the Second Circuit, which operated the facility. N.J. was placed in the Normile Family Center, a residential treatment area, but he was not free to leave. While there, N.J. received mental health treatment from PFH employees. BNJJC employees completed forms throughout N.J.'s stay that acknowledged his suicidal ideation and self-harm history as well as his recent hospitalization. Upon entry, N.J. was allowed to keep a white cloth belt.

On April 9, BNJJC employees informed N.J. that they would soon discharge him. After learning of his imminent discharge, N.J. placed the white cloth belt on his arm as a tourniquet twice in the presence of BNJJC employees, but the employees never confiscated the belt from N.J. The next day, N.J. told a PFH employee that he was frequently sleeping to avoid his feelings, and the employee observed N.J.'s flat affect, matter-of-fact statements, and lack of eye contact but did not communicate anything to BNJJC. Between April 9 and April 11, N.J. refused his medications, and on April 11, he refused an optional room check.

Harmon alleged that BNJJC had a policy to check on residents every 15 minutes. On April 11 at 2:16 p.m., N.J. entered his room and closed his door. At 2:18 p.m. and 2:25 p.m., a BNJJC employee checked on N.J. by looking through a peephole on his door. Thirteen minutes later, at 2:38 p.m., the employee again checked on N.J. through the peephole. She then saw N.J.'s bathroom door was closed, opened the bedroom door, and called for backup. Two men then opened the bathroom door and discovered that N.J. had hanged himself on the bathroom door using the white cloth belt. N.J. was flown to a hospital and subsequently died on April 15. A police examination of his room discovered that N.J. had scratched suicidal words and phrases into his notebook and his bathroom mirror. The death certificate said that N.J. died by suicide from complications of self-asphyxiation.

Harmon filed this lawsuit seeking damages for N.J.'s death, which included nine counts of various 42 U.S.C. § 1983 claims and state wrongful death claims against the Second Circuit, the Government Defendants, PFH, and the PFH Defendants. The Second Circuit and the Government Defendants filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim, and PFH and the PFH Defendants filed a motion to dismiss for failure to state a claim. The district court determined that it had subject matter jurisdiction based on federal question jurisdiction over the § 1983 claims and supplemental jurisdiction over the state tort claims.

Then, the court dismissed Harmon's claims against the Second Circuit. The court did so on two bases. First, our circuit has said a state court is not a "person" amenable to suit under § 1983. R. Doc. 74, at 8 (citing *Clark v. Clark*, 984 F.2d 272, 273 (8th Cir. 1993)). Second, the Second Circuit had Eleventh Amendment immunity. *Id.* at 8–9 (citing *McKlintic v. 36th Jud. Cir. Ct.*, 464 F. Supp. 2d 871, 875 (E.D. Mo. 2006), *aff'd by McKlintic v. 36th Jud. Cir. Ct.*, 508 F.3d 875, 877 (8th Cir. 2007)). Though Harmon argued that the state waived this immunity under Mo. Rev. Stat. § 537.600.1(2), that statute waived sovereign immunity, not Eleventh Amendment immunity. *Id.* at 10.

The court also dismissed Harmon's § 1983 claims against the Government Defendants. The court concluded that the Government Defendants were entitled to qualified immunity because Harmon failed to show that any constitutional violation was clearly established.

Lastly, the court dismissed Harmon's state tort claims against the Government Defendants. The Government Defendants were entitled to official immunity under state law for the tort claims because Harmon failed to plead both the existence of a department-mandated policy and breach of that policy. Harmon's complaint alleged that a department policy required a BNJJC employee to check on N.J. every 15 minutes, but Harmon also acknowledged a BNJJC employee checked on N.J.

through the peephole three times between 2:16 p.m. and 2:38 p.m., never more than 15 minutes apart.[2]

## II. *Discussion*

On appeal, Harmon argues that the district court erred in granting the Second Circuit and Government Defendants' motion to dismiss because (1) the Second Circuit failed to prove it was entitled to Eleventh Amendment immunity, (2) the Government Defendants are not entitled to qualified immunity for the § 1983 claims, and (3) the Government Defendants are not entitled to official immunity for the state tort claims. "We review the district court's grant of a motion to dismiss for failure to state a claim *de novo*." *Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F.4th 976, 979 (8th Cir. 2021).

## A. *Second Circuit*

The district court granted the Second Circuit's motion to dismiss because Harmon's claims against the court were barred by Eleventh Amendment immunity. Harmon argues that the district court made three errors in this holding. We affirm the district court's holding because the Second Circuit is not a person amenable to suit under § 1983 and the Second Circuit is entitled to Eleventh Amendment immunity, which Missouri has not waived here.

First, Harmon argues that the district court erred because the Second Circuit is a person amenable to suit under § 1983. Under 42 U.S.C. § 1983, "[e]very person who . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." But this circuit has said that a court is not a "person" subject to suit under § 1983. *Clark v. Clark*, 984 F.2d 272, 273 (8th Cir. 1993) ("Courts are not

---

[2]The district court granted in part and denied in part PFH's and the PFH Defendants' motion to dismiss. The remaining claims between Harmon and PFH and the PFH Defendants were settled following the district court's order, and those claims are not part of this appeal.

persons within the meaning of 42 U.S.C. § 1983, and, if they were, the action would be barred by the Eleventh Amendment, anyway."); *see also Harris v. Mo. Ct. of Appeals*, 787 F.2d 427, 429 (8th Cir. 1986).

Harmon asserts that the Second Circuit qualifies as a person under § 1983 because municipalities and counties are amenable to suit under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). We have previously rejected this argument. *See Harris*, 787 F.2d at 429. First, *Monell* said that local government units that are not considered part of the state are unprotected by the Eleventh Amendment, but under Missouri law, Missouri state courts are part of the state, not local government. *Id.* (citing *Monell*, 436 U.S. at 690 n.54). Second, *Monell* observed that individual officers were being sued to redress actions taken to benefit the city, so had the officers been immune, the city would be too. *Id.* (citing *Monell*, 436 U.S. at 687). Courts are different, however, because judges possess immunity in their own right as judicial officers. *Id.* Therefore, this court rejected the argument that Missouri state courts are people within § 1983 under *Monell. Harris*, 787 F.2d at 429 ("[C]ourts as entities are not vulnerable to § 1983 suits, because they are protected by state immunity under the eleventh amendment."). Therefore, the district court did not err in holding that the Second Circuit was not a "person" amenable to suit under § 1983.

Second, Harmon argues that the district court erred because the Second Circuit has not shown that it is an arm-of-the-state entitled to Eleventh Amendment immunity. Eleventh Amendment immunity protects courts. *Id.*; *see also McKlintic v. 36th Jud. Cir. Ct.*, 508 F.3d 875, 877 (8th Cir. 2007) (per curiam) (affirming the district court's holding that a suit against a Missouri circuit court was barred by the Eleventh Amendment because there was no waiver); *Wright v. Magill*, 779 F. App'x 416, 417 (8th Cir. 2019) (unpublished per curiam); *Collins v. Dakota Cnty. Dist. Ct.*, 435 F. App'x 581, 581 (8th Cir. 2011) (unpublished per curiam); *Merkl v. Pendleton*, 298 F. App'x 534, 534–35 (8th Cir. 2008) (unpublished per curiam). In arguing that the Second Circuit is not an arm-of-the-state, Harmon applies a test used by the Tenth Circuit. *See, e.g.*, *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 527

(10th Cir. 2022). We decline to adopt this test from our sister circuit. Our existing precedent plainly holds that Missouri state courts are entitled to Eleventh Amendment immunity. The district court did not err in holding that the Second Circuit had Eleventh Amendment immunity.

Third, Harmon contends that Missouri waived sovereign immunity under Mo. Rev. Stat. § 537.600.1(2). We disagree. The test for determining if a state has waived its Eleventh Amendment immunity is a stringent one: It requires that the state either (1) voluntarily invoke federal court jurisdiction or (2) "make[] a clear declaration that it intends to submit itself to our jurisdiction." *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76 (1999) (internal quotations omitted); *see also Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 473 (1987) ("[T]he Court will find a waiver by the State only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." (cleaned up)). "Thus, a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation." *Coll. Sav. Bank*, 527 U.S. at 676. Missouri law expressly retains such "sovereign or governmental tort immunity as existed at common law," Mo. Rev. Stat. § 537.600.1, but provides an exception to sovereign immunity for "[i]njuries caused by the condition of a public entity's property" if the plaintiff can prove several elements. *Id.* § 537.600.1(2).

Harmon argues that Missouri waived Eleventh Amendment immunity because she pleaded the elements of the State's sovereign immunity waiver. Harmon, however, conflates sovereign immunity and Eleventh Amendment immunity. "Sovereign immunity is the privilege of the sovereign not to be sued without its consent" that was developed at common law and broadly "applies against *all* private suits, whether in state or federal court." *Church v. Missouri*, 913 F.3d 736, 742 (8th Cir. 2019) (first quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011); and then quoting *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015)). Eleventh Amendment immunity, on the other hand, is just "one particular exemplification" of sovereign immunity. *Id.* (quoting *Fed. Mar. Comm'n*

*v. S.C. State Ports Auth.*, 535 U.S. 743, 753 (2002)). The Eleventh Amendment prohibits suits against a state in federal court, which reflects federalism principles by allowing states to decide both whether and where it may be sued. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984). Because of this difference, the Supreme Court has consistently held that "a State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." *Id.* at 99 n.9; *see also Fla. Dep't of Health and Rehab. Services v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981). "A State does not waive its Eleventh Amendment immunity by consenting to suit only in its own courts, and thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in federal court." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306 (1990) (cleaned up).

Missouri has not waived its Eleventh Amendment immunity. Missouri did not voluntarily invoke federal jurisdiction in this case, and it did not declare that it intended to submit to federal court jurisdiction. Section 537.600.1 expressly waives Missouri's common law sovereign immunity. This waiver is within the chapter dedicated to tort actions, which are state law claims. The statute never specifies, mentions, or implies that this sovereign immunity waiver should also be extended to act as an Eleventh Amendment immunity waiver in federal court. A waiver of sovereign immunity is not a waiver of Eleventh Amendment immunity. Missouri's statute waives common law sovereign immunity with no clear declaration to additionally waive Eleventh Amendment immunity. Consequently, the district court did not err in holding Missouri did not waive Eleventh Amendment immunity under § 537.600.1(2).

Thus, we conclude that the Second Circuit cannot be sued under § 1983 because they are not a "person" amenable to suit under the statute. Even if they were, Harmon's § 1983 and state tort claims against the Second Circuit are barred by Eleventh Amendment immunity, which Missouri has not waived. Accordingly, we affirm the district court's dismissal of Harmon's claims against the Second Circuit.

B. *Qualified Immunity*

Harmon alleges that the Government Defendants violated N.J.'s Fourteenth Amendment substantive due process rights by (1) failing to maintain policies, practices, customs, and procedures necessary for protecting at-risk juveniles like N.J. (Count I); (2) failing to provide adequate protection, a safe environment, and reasonable medical care where the State has a "special relationship" with N.J. (Count II); and (3) failing to address N.J.'s serious medical needs and failing to provide safe, humane living conditions (Count III). The district court held that the Government Defendants were entitled to qualified immunity because Harmon failed to show that the alleged violations were clearly established. We affirm.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019). Courts have discretion to decide the order to evaluate the two prongs of the qualified immunity analysis. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

Clearly established means that, at the time of the alleged violation, the legal principle must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (internal quotation marks omitted). "[The] legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.* "This generally requires a plaintiff to point to existing circuit precedent that involves sufficiently similar facts to squarely govern the officers' conduct in the specific circumstances at issue, or, in the absence of binding precedent, to present a robust consensus of cases of persuasive authority constituting settled law." *Graham v. Barnette*, 5 F.4th 872, 887 (8th Cir. 2021) (cleaned up). The law cannot be defined "at a high level of generality," and the plaintiff's proffered precedent "must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S.

73, 79 (2017) (first quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011); and then quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"Showing that a right was clearly established requires identifying controlling precedent with a close correspondence to the particulars of the present case." *Rusness v. Becker Cnty.*, 31 F.4th 606, 615 (8th Cir. 2022). "This means that the right in question must be construed fairly narrowly and that facts in the present case must align with facts in precedent." *Id.* There does not need to be a case directly on point, but the existing law must put the constitutional question beyond debate. *White*, 580 U.S. at 79. The plaintiff bears the burden to show that the violation was clearly established. *Est. of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018).

Harmon argues that it is clearly established that the Fourteenth Amendment requires the state to protect people in its custody and those subjected to a state-created danger. Harmon, however, falls short of showing the alleged constitutional violation was clearly established. She provided no precedent with sufficiently analogous facts to place the Government Defendants on notice that their conduct fell below a constitutional standard. Harmon, instead, relies on broad and generalized legal principles that are insufficiently analogous to the specific facts of this case.

Harmon relies on *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), but *DeShaney* is too dissimilar. In *DeShaney*, a mother brought a § 1983 action against social workers and local officials who knew her child was being abused by his father but did not remove the child from the father's custody. The Supreme Court held that the defendants did not violate the child's Fourteenth Amendment substantive due process rights because they had no duty to protect the child against the father's violence. *Id.* at 191, 202. Harmon relies on *DeShaney* because the Court noted that a special relationship arises between the state and people in their custody, which obligates the State to provide adequate protection. *Id.* at 199–200. To be sure, *DeShaney* represents a constitutionally significant general principle, but its high level of generality is insufficient for it to clearly establish a right in this case. Significantly, the officials in *DeShaney* were not

held to have violated any constitutional right. *DeShaney* did not clearly establish that the Government Defendants violated N.J.'s rights because it is not sufficiently analogous to put a reasonable officer on notice that their actions violated N.J.'s substantive due process rights.

Harmon also relies on *Youngberg v. Romeo*, 457 U.S. 307 (1982), to show that it is clearly established that a state has the duty to protect people who are institutionalized or wholly dependent on the state. *See id.* at 317. *Youngberg* is also cited for the proposition that the Fourteenth Amendment creates a right to safe conditions when the state confines someone. *See id.* at 316, 324. Again, these are accepted general constitutional principles. They are, however, insufficiently like the instant facts to meet the clearly established standard set forth by the Supreme Court. In *Youngberg*, the mother of a severely mentally disabled man brought a § 1983 action against the director and supervisors of the state facility where he was committed. *Id.* at 307. She alleged that her son was injured at least 63 times at the institution, some injuries caused by others and some self-inflicted. *Id.* at 309–10. The Supreme Court vacated the Third Circuit's decision and remanded the case with instructions that judgments by professionals on matters of care, safety, and training of civilly committed people are presumptively correct and give rise to liability only where it substantially departed from the accepted professional practice. *Id.* at 323–25. The officer in *Youngberg* acted under substantially different circumstances than this case because *Youngberg* involved dozens of injuries, some self-inflicted and some not, and the use of physical restraint. *See id.* at 310–11. Additionally, the case did not hold that any substantive due process rights were violated and instead remanded with instructions on professional judgment. *See id.* at 324–25. Thus, *Youngberg* would not put a reasonable officer in the Government Defendants' position on notice that their actions violated N.J.'s substantive due process rights.

Harmon's other cited authorities fare no better in showing a violation of a clearly established right. *See Hart v. City of Little Rock*, 432 F.3d 801, 807 (8th Cir. 2005) (holding the city did not violate Fourteenth Amendment rights when they released the personnel files of police officers to criminal defense lawyers without

notice or redaction because the city did not act with deliberate indifference toward a risk of serious harm); *Boswell v. Sherburne Cnty.*, 849 F.2d 1117, 1122–23 (8th Cir. 1988) (finding a genuine issue of material fact that precluded summary judgment on whether the defendants were entitled to qualified immunity in a § 1983 action brought by a pregnant pretrial detainee who requested but was denied medical care while she miscarried).

Because Harmon failed to show that the alleged substantive due process violations were clearly established, the Government Defendants are entitled to qualified immunity for the § 1983 claims. Thus, we affirm the district court's order dismissing Harmon's § 1983 claims against the Government Defendants.

## C. *Official Immunity*

The district court dismissed Harmon's state tort claims against the Government Defendants, concluding that the Government Defendants are entitled to official immunity. The court found that Harmon's complaint did not plead both the existence of a policy imposing a duty on the defendants and a breach of that duty as required by Missouri law. Harmon argues that the district court erred because BNJJC's 15-minute check policy was ministerial, not discretionary, and because the policy was ministerial, the Government Defendants are not entitled to official immunity. We affirm the district court's holding that the Government Defendants are entitled to official immunity.

Under Missouri law, official immunity "protects public officials sued in their individual capacities from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *State ex rel. Love v. Cunningham*, 689 S.W.3d 489, 494–95 (Mo. 2024) (quoting *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. 2019) (en banc)). This immunity protects "individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties" by allowing the officials "to make judgments affecting the public safety and welfare without the fear of personal liability." *Id.* at 495 (first quoting *Southers v. City of Farmington*,

-12-

263 S.W.3d 603, 611 (Mo. 2008) (en banc); and then quoting *Alsup*, 588 S.W.3d at 190). Immunity means "not only immunity from judgment but also immunity from suit." *Id.* (quoting *State ex rel. Morales v. Alessi*, 679 S.W.3d 467, 471 (Mo. 2023) (en banc)). Thus, courts "must be cautious not to construe [official immunity] too narrowly lest they frustrate the need for relieving public servants of the threat of burdensome litigation." *Id.* (quoting *Alsup*, 588 S.W.3d at 191).

There are two narrow exceptions to Missouri's official immunity: (1) when the official fails to perform a ministerial duty required by law, and (2) when the official acts in bad faith or with malice. *Id.* (citing *Alsup*, 588 S.W.3d at 190). Harmon argues that the Government Defendants are not entitled to official immunity because BNJJC's 15-minute check policy imposed a ministerial duty.

Ministerial duties are typically clerical in character and such that they "compel[] a task of such a routine and mundane nature that it is likely to be delegated to subordinate officials." *Alsup*, 588 S.W.3d at 191. A duty is ministerial when "a certain act is to be performed upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority, and without regard to the public official's judgment or opinion concerning the propriety or impropriety of the act to be performed." *Id.* (cleaned up). "[T]he central question is whether there is any room whatsoever for variation in when and how a particular task can be done. If so, that task—by definition—is not ministerial." *Id.*; *see also Love*, 689 S.W.3d at 495–96 ("The central inquiry is not whether the law confers a duty to act but, instead, whether the public official retains any discretion in completing an act." (cleaned up)).

Harmon argues that the Government Defendants are not entitled to official immunity because BNJJC's resident-check policy is ministerial, like the policy in *Letterman v. Does*, 859 F.3d 1120 (8th Cir. 2017). Harmon's focus on *Letterman* is misplaced because it ignores the basis for the district court's ruling that the Government Defendants were entitled to official immunity: Harmon failed to plead

that a BNJJC employee breached the policy by failing to check on N.J. every 15 minutes, which is a prerequisite to state a claim not barred by official immunity.

Under Missouri law, "[a] plaintiff must plead facts establishing an exception to official immunity." *Alessi*, 679 S.W.3d at 471 (quoting *Stephens v. Dunn*, 453 S.W.3d 241, 251 (Mo. Ct. App. 2014)). "Absent these allegations, the pleadings are insufficient to state a claim which is not barred by the doctrine of official immunity as a matter of law." *Id.* (quoting *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 445 (Mo. 1986) (en banc)). Specifically, a plaintiff must plead (1) the existence of a statutory or departmentally mandated duty, and (2) a breach of that duty. *Twiehaus*, 706 S.W.2d at 445; *see also Stephens*, 453 S.W.3d at 250 (finding the plaintiff did not allege facts establishing an exception to official immunity because the plaintiff did not allege the existence nor breach of a duty but rather made the bald assertion the officials acted in bad faith without specific facts on the issue). This threshold pleading requirement makes sense: The official must be shown to have failed to perform a ministerial duty. *See Alsup*, 588 S.W.3d at 191. If the Government Defendants followed BNJJC's policy, then the ministerial exception to official immunity would not apply. Immunity precludes litigation as well as liability. *See Morales*, 679 S.W.3d at 471. Consequently, the plaintiff must plead that a duty was breached before litigation proceeds. The district court held that the Government Defendants were entitled to official immunity because, even if the 15-minute check policy was ministerial, Harmon did not allege the breach of that duty.

Harmon pleaded BNJJC had a policy that "N.J. was to be checked on by employees . . . at least every 15 minutes." R. Doc. 46 ¶ 155. Harmon then pleaded that a BNJJC employee checked on N.J. through the peephole of the door three times during the relevant period never more than 15 minutes apart: once at 2:18 p.m., two minutes after N.J. entered his room and closed the door; once at 2:25 p.m.; and once at 2:38 p.m., when she then saw N.J.'s bathroom door was closed, opened the bedroom door, and called for backup. Therefore, Harmon's pleadings do not allege that a BNJJC employee breached the policy because the employee did check on N.J.

every 15 minutes, so her pleadings are insufficient to state a claim that is not barred by official immunity.

Harmon argues that she pleaded a breach because BNJJC employees allowed N.J. to stay in his room with the door closed for 22 minutes, which she says violated BNJJC policy. But the only policy pleaded is that an employee had to check on N.J. every 15 minutes, and Harmon pleaded the BNJJC employee checked on N.J. three times during the relevant period, never more than 15 minutes apart. Harmon did not plead that the BNJJC policy did not permit checks through the peephole, nor did she plead a policy that N.J. could not keep his door closed. Rather, she pleaded that a BNJJC employee had to check on N.J. every 15 minutes and then pleaded that a BNJJC employee checked on N.J. three times, never more than 15 minutes apart.

*Letterman* is inapposite. The analysis there focused on whether the policy was ministerial, not whether the plaintiff met the threshold pleading requirement. *See Letterman*, 859 F.3d at 1126–27. Thus, even if *Letterman* would require us to find the 15-minute check policy was ministerial, *Letterman* does not require a reversal because, as a threshold matter, Harmon failed to properly plead an exception to official immunity as required under Missouri Supreme Court precedent.

Because Harmon did not allege both the existence of a policy and a breach of that policy, her pleadings are insufficient to state a claim that is not barred by official immunity under Missouri law. We therefore affirm the district court's dismissal of Harmon's state tort claims against the Government Defendants.

### III. *Conclusion*
For the foregoing reasons, we affirm.

_____

-15-