# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-3900

———————

| | |
|---|---|
| Jela D. Jones, as Trustee for the heirs of Brenda Diane Jones, deceased,<br><br>        Plaintiff – Appellant,<br><br>v.<br><br>Minnesota Department of Corrections, Rick Hillengass, Heidi Gillies, Laura Westphal, Kathy Duklet, Troy Hedtke, Dave Knutson, Kevin Fors, Schahara Schutte, Marla Prescott, Katie Ziegler, Dave Hergott, Darryl Galloway, and Pamela Smith, each individually and in their official capacities,<br><br>        Defendants – Appellees. | Appeal from the United States District Court for the District of Minnesota. |

———————

Submitted: October 19, 2007
Filed: January 9, 2008

———————

Before LOKEN, Chief Judge, GRUENDER, and BENTON, Circuit Judges.

———————

BENTON, Circuit Judge.

Jela D. Jones sued the Minnesota Department of Corrections and individual prison officials for allegedly violating his mother's Eighth Amendment rights, by deliberate indifference to her serious need of medical care, causing her death. The

district court[1] granted summary judgment to the defendants.  Jones appeals.  Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

On November 4, 2003, Brenda Diane Jones was sentenced to 33 months in prison for aiding and abetting a controlled substance crime.  She was then held at the Blue Earth county jail for three days awaiting transfer to the Minnesota Department of Corrections facility in Shakopee.  Blue Earth officers told Shakopee officers that Jones had been "fine" until told of the transfer, at which point she became "violently sick" and "uncooperative."  As suggested by Blue Earth, Shakopee had extra officers to assist Jones from the vehicle.  Jones arrived at Shakopee at 9:45 a.m., during the second watch shift. Officers directed her to exit the vehicle.  She did not respond, mumbling and exhibiting a blank stare.  As two officers tried to help Jones out of the vehicle, she swung her legs to the side as if attempting to exit.[2]  One officer pushed Jones from behind, another pulled from the front, in order to remove her from the vehicle.  Jones had an unpleasant odor, like urine or body odor, which was noted by various officers throughout the intake process.

Once outside the vehicle, she sat down on the floor of the intake garage.  Jones, mumbling, did not comply with instructions to stand up.  One officer applied a pressure-point technique to make Jones comply, which produced no response.  Officers called for more assistance.  One officer described Jones as grunting and rolling around on the floor.  Many officers described Jones's breathing as "heavy," "labored," and "fast paced."  No officer thought Jones was having trouble catching her

---

[1] The Honorable Richard H. Kyle, United States District Court for the District of Minnesota.

[2] The autopsy reported that Jones was morbidly obese, weighing 285 pounds at 5'1" tall.

breath. Most officers stated that her breathing was rapid as if she had been exerting herself. One officer said that her breathing sounded like his breathing used to sound when he was overweight. One officer thought Jones might be over-medicated. Another officer would have called for an A-team response and medical, but did not because the A-team and watch commander were already there. The officers lifted Jones into a wheelchair, transporting her to the Mead Unit for the intake process.

By policy, inmates must be screened for medical, dental, and mental health within 24 hours of arrival at Shakopee. Lt. Westphal – concerned that, due to her size, Jones could not walk or stand during intake – started the screening immediately. Nurse Pamela Smith began the evaluation, but did not complete it because Jones did not answer her questions. Nurse Smith did take Jones's pulse (which was normal) and respiration (which was three times faster than normal). Nurse Smith stated that Jones's respiration returned to normal by the end of the examination, but her records do not indicate a second respiration rate. Jones drank two glasses of water after Nurse Smith offered her a drink. Nurse Smith noted that Jones appeared "uncomfortable," grunting, with dried blood on her mouth and lips. Lt. Westphal also noticed severe chapping and cracking of her lips. Nurse Smith's records indicate that Blue Earth had not noted any heart problems, and that she planned to re-examine Jones in "a day or so" when she might be more cooperative. Nurse Smith told officers that Jones was able to proceed with intake.

By policy, inmates must submit to an unclothed body search as part of intake. Told of the search, Jones replied "you want me to do what?" Asked to remove her clothing, Jones took one arm out of her jail uniform, but did not respond to further requests. Officers stated that Jones seemed unwilling or unable to get out of the wheelchair, commenting that her feet hurt and she wanted to remove her socks. One officer helped remove her socks, looked at her feet and legs, but did not think they appeared swollen. Because Jones would not cooperate with the unclothed body search, four female officers performed a staff-assisted unclothed body search. She

moaned and grunted throughout the search, saying her neck and arm hurt when the officers held them. When one officer inquired whether Jones was "ok," she grunted in response.

A medical examination is required after a staff-assisted unclothed body search. Sgt. Hedtke asked Nurse Smith to perform the examination. Nurse Smith claims she performed the examination, finding no signs of injury. Two officers and another inmate stated, however, that Nurse Smith was in the cell with Jones for only 15 seconds, telling her, "this is what happens when people don't listen to officers," without asking Jones any medical questions.

Shortly after the body search, the second watch officers left due to a shift change. Lt. Westphal briefed the watch commander for the third shift on the occurrences of the day. During the third shift, inmates reported that Jones was moaning in her cell. Officer Eskelson – noticing Jones's eyes appeared strange and were darting back and forth – asked Nurse Smith if she was planning to look in on Jones during her rounds (although not required by policy since Jones was not on medication). Nurse Smith responded that she had seen Jones earlier in the day and nothing was wrong with her. As part of her rounds, Officer Eskelson checked on Jones every half hour; each time it appeared Jones was resting. Later, Officer Eskelson sent an email stating, "This new one on the bed naked – no one cares." Eskelson found Jones unresponsive in her cell at 9:03 p.m. Emergency medical staff performed CPR. Jones was pronounced dead at 9:35 p.m, about 12 hours after arriving at Shakopee. Autopsy revealed she died of a pulmonary edema. During her 12 hours at Shakopee, Jones never told anyone that she needed medical attention; only complaining that her feet hurt, and that her neck and arm hurt during the search.

Jela Jones, as trustee for his mother's heirs, sued the Minnesota Department of Corrections, individual officers, and Nurse Smith. In addition to the Eighth Amendment claims, Jones also brought state-law claims for excessive force and

wrongful death.  The district court dismissed the claims against the Department and the individual defendants in their official capacity, based on the Eleventh Amendment. The court granted summary judgment to the individual defendants in their personal capacities, finding that Jones did not suffer from an objectively serious medical need, the defendants were not subjectively aware of a serious medical need, and the defendants did not deliberately disregard a serious medical need.  The court declined supplemental jurisdiction over the state law claims, dismissing them without prejudice.  Jones appeals the grant of summary judgment to the individual defendants in their personal capacities.

II.

This court reviews *de novo* a grant of summary judgment.  *See **RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,*** 49 F.3d 399, 401 (8th Cir. 1995). Summary judgment is appropriate if, taking the facts in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See **Fed. R. Civ. P. 56(c)***; ***Celotex Corp. v. Catrett,*** 477 U.S. 317, 323 (1986).  A genuine issue of material facts exists if there is a dispute about a fact material to the outcome of the case, and the dispute is genuine in that a reasonable jury could return a verdict for either party.  *See **RSBI,*** 49 F.3d at 401.

"It is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs."  ***Gregoire v. Class,*** 236 F.3d 413, 417 (8th Cir. 2000). In a deprivation of medical care case, the inmate must show (1) an objectively serious medical need; and (2) the defendants actually knew of the medical need but were deliberately indifferent to it.  *See **Grayson v. Ross,*** 454 F.3d 802, 808-09 (8th Cir. 2006).

An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a "layperson would easily recognize the necessity for a doctor's attention." *See Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997), *quoting Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995). " 'To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk.' Rather, a plaintiff must demonstrate the official actually knew of the risk and deliberately disregarded it." *Vaughn v. Greene County, Ark.,* 438 F.3d 845, 850 (8th Cir. 2006), *quoting Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious. *See Farmer,* 511 U.S. at 842. If prison officials have actual knowledge of a serious medical need, and fail to take reasonable measures to address it, they may held liable for deliberate indifference. *See id.* at 847. "However, '[a] showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." *Pietrafeso v. Lawrence County, S.D.,* 452 F.3d 978, 983 (8th Cir. 2006), *quoting Gibson v. Weber,* 433 F.3d 642, 646 (8th Cir. 2006).

## A.

The determination that a medical need is objectively serious is a factual finding. *See Rahija,* 114 F.3d at 784. If there is a dispute, and a reasonable jury could return a verdict for either party, then summary judgment is not appropriate. Here, Jones was not diagnosed by a physician as requiring treatment. Therefore, Jones's condition must have been so obvious that a layperson would easily recognize the need for treatment. On the undisputed facts of this case, no reasonable jury could find that Jones suffered from an objectively serious medical need.

This court has found a serious medical need that was obvious to a layperson where an inmate: was pregnant, bleeding, and passing blood clots, *see Pool v. Sebastian County, Ark.,* 418 F.3d 934, 945 (8th Cir. 2005); had swollen and bleeding gums and complained of extreme tooth pain, *see Hartsfield v. Colburn,* 371 F.3d 454, 457 (8th Cir. 2004); experienced excessive urination, diarrhea, sweating, weight loss, and dehydration related to known diabetes, *see Roberson v. Bradshaw,* 198 F.3d 645, 647-48 (8th Cir. 1999); or exhibited signs of early labor and her medical records clearly documented a history of rapid labor and delivery, *see Rahija,* 114 F.3d at 785.

The determination whether a medical need is sufficiently obvious cannot be analyzed in a vacuum. The prison officials' background knowledge is part of the analysis. *See Roberson,* 198 F.3d at 647-48 (describing the deputy's knowledge of inmate's diabetes and complaints in determining whether inmate suffered from medical condition obvious to a layperson); *Rahija,* 114 F.3d at 784-85 (discussing inmate's medical records which indicated previous rapid delivery in finding it would have been obvious to a layperson that inmate required medical attention for pre-term labor). In each of the cases cited, the inmate exhibited physical symptoms related to known medical issues or to complaints of pain.

Jones claims that his mother "was unable to stand or walk under her own power, was 'google-eyed' and unresponsive, was rolling on the ground while grunting and groaning, was bleeding from the mouth,[3] smelled as if she had urinated on herself, and was breathing at a very rapid rate" which made it obvious to a layperson that his mother needed medical attention. Jones's symptoms are not a sufficiently obvious medical issue. Unlike passing blood clots while pregnant; bleeding gums with complaints of extreme tooth pain; excessive urination, dehydration, sweating, and weight loss; and signs of early labor – which all obviously indicate a medical issue –

---

[3] The record does not support the assertion that Jones was "bleeding from the mouth." The record does show that she had dried blood and cuts on her lips.

Jones's symptoms are not easily recognizable medical issues. *See Grayson,* 454 F.3d at 809-10 (not obvious to a layperson that pre-trial detainee needed medical treatment where detainee was found in a creek, soaking wet; was combative; gave nonsense answers to questions; began screaming while in the holding cell; and officers were aware that detainee had taken meth). Importantly, in this case the prison officials had no background knowledge that made it obvious that these symptoms required medical attention. True, Blue Earth staff checked the "medical problems" box on the form sent to Shakopee, but they also checked all the other boxes: behavioral problems, psychological problems, and incompatibility with other inmates. The form also indicated that Jones was a "difficult inmate" and that Blue Earth staff would "send all applicable incident reports." There was no elaboration on any medical problems. Blue Earth staff told Shakopee officers that Jones had become violently sick and uncooperative, but only upon learning of her transfer to Shakopee. Blue Earth also informed Shakopee that Jones was able to move around and partake in day-to-day activities before hearing of the transfer. Taking Jones's symptoms in context, and given that Jones never expressed a need for medical attention, a reasonable jury could not find that Jones had a medical need so obvious that a layperson would easily recognize the need for a doctor's immediate attention.

Jones relies on *Johnson v. Hamilton,* 452 F.3d 967, 973 (8th Cir. 2006), where this court found that a fractured finger was an objectively serious medical need. In *Johnson,* however, there was a tentative diagnosis that the finger was fractured, so that case did not address the "so obvious a layperson would easily recognize it" prong. Similarly, in *Bryan v. Endell,* 141 F.3d 1290, 1291 (8th Cir. 1998), an inmate's broken hand had been treated, and therefore there was no discussion of whether a broken hand is sufficiently obvious.

Jones also argues that "certain medical conditions are *per se* serious, such as conditions resulting in death." No doubt, a diagnosis of pulmonary edema would

constitute a serious medical condition. *See* ***Robinson v. Hager,*** 292 F.2d 560, 564 (8th Cir. 2002) (assuming that a stroke is a "serious medical harm, the risk of which was substantial in plaintiff's case" due to known hypertension). The question here, however, is not, in hindsight, whether Jones had a serious medical condition, but rather, whether the condition was so obvious that a layperson would have easily recognized the need for medical treatment. While some medical conditions that result in death are obvious to a layperson, not all are. *See* ***Grayson,*** 454 F.3d at 809-10 (no objectively serious medical need because it would not have been obvious to a layperson that an inmate required immediate medical attention even though intoxication resulted in death). A medical condition is not *per se* obvious to a layperson because it later results in death.

B.

There is no genuine dispute that any of the defendants were deliberately indifferent to Jones's known medical need. Jones claims that the defendants had actual knowledge of a serious medical need, but on this record no reasonable jury could find that they did.

No circumstantial evidence supports the inference that any defendant believed Jones had a serious medical issue. Jones points to Lt. Westphal's suspicions that there were "medical issues." Describing Jones's behavior in the intake garage, Lt. Westphal stated that she "couldn't tell [] if it was a withdrawal thing or whether it was a medical issue." Lt. Westphal described Jones's grunting as "sighing, oh poor me[,] I am here and I don't want to be." She also stated that "when I addressed [Jones] and gave her her options, it instantaneously stopped." When Lt. Westphal spoke with the nurses about performing the medical screening immediately, she stated, "I can't imagine that there is not something medical because of her weight." Lt. Westphal told the nurses that she needed to know "can this person walk, can she not walk, can she do the intake

-9-

process by herself or do I need to figure out a different way of doing this." Taken as a whole, Lt. Westphal's statements do not show that she believed Jones had an objectively serious medical need. The most generous inference from this evidence is that Lt. Westphal thought Jones may have long-term medical issues due to her weight. The evidence does not support the inference that Lt. Westphal believed Jones required immediate medical attention.

Since Jones's medical issues were not obvious, actual knowledge cannot be inferred from the obviousness of the need. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer,* 511 U.S. at 838. At most, the Shakopee staff was negligent in not recognizing a medical need, which does not rise to the level of deliberate indifference. *See James ex rel. James v. Friend,* 458 F.3d 726, 730 (8th Cir. 2006) ("A review of appellees' conduct in this case, however arguably negligent it may now appear in the clear light of hindsight, does not reveal the existence of deliberate indifference.").

C.

Jones asserts that the defendants are not entitled to qualified immunity. Government officials are entitled to qualified immunity for discretionary decisions unless they violate a clearly established constitutional right. *See Gordon ex rel. Gordon v. Frank,* 545 F.3d 858, 862 (8th Cir. 2006). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *See Vaughn,* 438 F.3d at 852. Because (as determined above) the defendants did not violate Jones's Eighth Amendment rights, they are entitled to qualified immunity. *See Grayson,* 454 F.3d at 808 ("If the answer [to whether a constitutional right was violated] is no, we grant qualified immunity.").

-10-

Jones contends that Nurse Smith is not entitled to qualified immunity because her duty to examine his mother was ministerial, not discretionary. Qualified immunity is defeated, however, only where the violation of the ministerial duty gives rise to the cause of action. *See **Sellers ex rel. Sellers v. Baer,*** 28 F.3d 895, 902 (8th Cir. 1994) ("[P]laintiffs make no claim that they are entitled to damages simply because the regulations they cite were violated. Instead, they seek damages based on their claims that the Fifth and Fourteenth Amendments were violated. Thus, the issue before us is whether the officers' conduct violated any clearly established constitutional rights, not whether the officers may have violated departmental regulations."). Jones's claim is based on a violation of his mother's Eighth Amendment rights, not violations of Department directives and guidelines on medical screenings. Therefore, even if Nurse Smith violated one of her ministerial duties to examine Jones (which this court need not decide), she is entitled to qualified immunity.


III.


The judgment of the district court is affirmed.


_____