# United States Court of Appeals
## For the Eighth Circuit
_____

No. 24-2579
_____

Juan Mitchell, Individually and on behalf of Jovon Mitchell, deceased

*Plaintiff - Appellant*

v.

Saint Louis County, Missouri; Emily Doucette; Raul Banasco; Todd Parker, PA;
Connie Heitman, RN; Vicki Reynolds, RN; Shyla Howard, RN

*Defendants - Appellees*

Katie Cora, RN

*Defendant*

John and Jane Does 1-10

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: September 18, 2025
Filed: December 4, 2025
_____

Before SMITH, GRUENDER, and SHEPHERD, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Jovon Mitchell ("Jovon") died of a stroke while he was a detainee in the St. Louis County jail. His brother, Juan Mitchell ("Mitchell"), brought this suit under 42 U.S.C. § 1983, alleging that St. Louis County and certain county staff violated Jovon's constitutional rights. Mitchell also brought state law claims, invoking the court's supplemental jurisdiction. The district court dismissed the § 1983 claims for failure to state a claim and declined to exercise jurisdiction over the state law claims. Mitchell appeals. For the reasons below, we affirm in part and reverse in part.

## I.  Background

### A.  Factual Allegations

When reviewing the grant of a motion to dismiss, we assume the facts alleged in the complaint are true. *Varga v. U.S. Bank Nat. Ass'n*, 764 F.3d 833, 838 (8th Cir. 2014). Mitchell's complaint alleges the following facts.

On or about December 23, 2019, Jovon began vomiting and experiencing a terrible headache. These symptoms worsened on December 24. That day, defendant correctional officers John Does 1-2 did not make Jovon stand up during "sign-of-life" or "standing health" checks, in contradiction of jail policy. Around 1:30 p.m., a nurse noted Jovon's symptoms as vomiting, nausea, and dizziness. The nurse reported Jovon's condition to defendant Todd Parker, a physician assistant ("PA") at the jail. PA Parker prescribed some medication and instructed the nursing staff to report any new complaints by Jovon or any abnormalities in his vitals to the on-call medical provider. Later that evening, a nurse told PA Parker that Jovon was continuing to vomit. At some point (unspecified in the complaint), PA Parker stated that if Jovon had difficulty walking, he might need to go to the hospital.

Around 4:00 a.m. on December 25, Jovon or his cellmate pressed an emergency call button. Jovon told unit control that he had "the worst headache of

-2-

his life" and that he was dizzy and unable to walk. The medical staff had a standing order, signed by defendant Dr. Emily Doucette, to contact a doctor immediately if a patient complains of "the worst headache of their life." Around 4:15 a.m., defendant Connie Heitman, a nurse at the jail, arrived at Jovon's cell, accompanied by two correctional officers, John Does 3-4. Nurse Heitman recorded Jovon's symptoms as a bad headache, throbbing in the forehead, nausea, vomiting, difficulty standing, and complaints of an inability to eat. She gave him a Tylenol. Jovon's gait was unsteady during Nurse Heitman's visit, but she did not inform PA Parker of this. Nurse Heitman also did not record Jovon's blood pressure as required by standing orders and jail policy. A correctional officer present during Nurse Heitman's visit stated that during the visit, Jovon had slurred speech and pleaded to be transferred to the infirmary. Nurse Heitman did not transfer him there.

Around 6:00 a.m., Jovon or his cellmate again pressed the emergency call button to complain that Jovon's symptoms were worsening. A correctional officer notified Nurse Heitman, who responded that Jovon would need to wait for when the morning nurse was available. At 6:50 a.m., other detainees helped Jovon—unable to walk on his own—to visit the morning nurse. While waiting for the nurse, Jovon attempted to hold himself upright against a wall, but he eventually slid down onto the floor. He lay on the floor for roughly ten minutes until he was carried by other detainees to the nurse, defendant Vicki Reynolds.

Around 7:15 a.m., Nurse Reynolds assessed Jovon. She noted his symptoms as a serious headache, vomiting, and a dry mouth, and that he felt he was going to pass out. Nurse Reynolds contacted PA Parker and had Jovon returned to his cell. Nurse Reynolds later admitted that she delayed providing further treatment or sending Jovon to the infirmary to ensure that he was not malingering. Jovon had no prior history of malingering and had been a cooperative and compliant detainee.

Around 10:30 a.m., during a medication round, Nurse Reynolds noted that Jovon had an "unsteady gait." She also noted that she talked to PA Parker, and that Jovon was to be sent to the infirmary. Around 12:30 p.m., Jovon was told to leave

his cell and go to the infirmary. Video shows Jovon staggering out of the cell block. Around 12:40 p.m., Jovon was taken in a wheelchair to the infirmary.

Defendant Shyla Howard was an infirmary nurse that day, and she noted Jovon's symptoms as a throbbing headache, vomiting, slurred speech, a dry mouth, and dehydration. Nurse Howard did not take Jovon's vitals during the visit. She reported her observations to PA Parker, who ordered blood pressure tests and suggested Nurse Howard provide Jovon with intravenous fluids if he "was unable to drink enough or hold it in." Nurse Howard gave Jovon a cup of water. She also ordered blood pressure tests, which began around 1:15 p.m. and continued roughly an hour later.

After the blood pressure tests, Jovon was sent to an infirmary cell, where he was kept alone for roughly three hours. At 5:14 p.m., defendant Sean McMahan, a correctional officer, observed Jovon laying unresponsive on the floor of his cell but did not take immediate action. Minutes later, defendant nurse Katie Cora found Jovon unconscious and no longer breathing. Nurse Cora attempted to resuscitate him using certain equipment, but the equipment malfunctioned. Additional nurses arrived with functional equipment, but they too could not resuscitate Jovon. Soon after, Jovon was transferred to the hospital. On December 27, 2019, Jovon was pronounced brain dead. His cause of death was a stroke.

Defendant Raul Banasco, the Director of Justice Services for the County, supervised the jail's correctional officers. He was aware that inmates with symptoms similar to Jovon's had suffered injuries and death because of county employees' failure to conduct security tours and to require that detainees stand up for health checks. Defendants Dr. Doucette and John Does 5-6 supervised the jail's provision of medical care. Dr. Doucette was aware that inmates with symptoms similar to Jovon's had suffered injuries and death because of county employees' failure to provide adequate medical care.

-4-

## B. Procedural History

Mitchell sued St. Louis County and several of its jail and medical staff under 42 U.S.C. § 1983 and Missouri state law. Mitchell alleged that defendants Nurse Heitman, Nurse Reynolds, Nurse Howard, PA Parker, and John Does 1-4 violated Jovon's Eighth and Fourteenth Amendment rights through deliberate indifference to his serious medical needs. Mitchell also alleged that defendants Dr. Doucette, John Does 5-6, and St. Louis County deprived Jovon of his constitutional rights because their failure to train their subordinates resulted in his death. Mitchell further alleged that St. Louis County maintained unconstitutional policies, practices, or customs that resulted in Jovon's death. Finally, Mitchell brought several state law claims against Defendants, invoking the district court's supplemental jurisdiction.[1]

Defendants filed motions to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The employee defendants also argued that they were protected by qualified immunity. The district court granted Defendants' motions to dismiss Mitchell's § 1983 claims for failure to state a claim. Because it had dismissed Mitchell's federal claims, the district court then declined to exercise supplemental jurisdiction over Mitchell's state law claims. The district court did not address qualified immunity. Mitchell appeals.

---

[1]In addition, Mitchell brought deliberate indifference claims against Nurse Cora and Officer McMahan, but Mitchell did not appeal the dismissal of the claim against Nurse Cora, and the district court dismissed without prejudice Mitchell's claims against Officer McMahan in a separate order. Further, Mitchell brought failure-to-train claims against Director Banasco and PA Parker, but Mitchell expressly declined to appeal the dismissal of this claim against Director Banasco, and Mitchell waived this claim against PA Parker by failing to address it on appeal. *See Meyers v. Starke*, 420 F.3d 738, 743 (8th Cir. 2005) ("To be reviewable, an issue must be presented in the brief with some specificity. Failure to do so can result in waiver.").

## II. Discussion

We review *de novo* the grant of a motion to dismiss for failure to state a claim. *Troupe v. Young*, 143 F.4th 955, 967 (8th Cir. 2025). At this stage, we address only whether Mitchell has "state[d] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We do not address the merits of the underlying claims. *See Norfolk & Dedham Mut. Fire Ins. Co. v. Rogers Mfg. Corp.*, 122 F.4th 312, 317 (8th Cir. 2024). We assume "all factual allegations in the complaint are true" and make "all reasonable inferences in favor of" Mitchell. *See Dormani v. Target Corp.*, 970 F.3d 910, 914 (8th Cir. 2020). However, a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Because "each Government official . . . is only liable for his or her own misconduct," *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009), we must examine each defendant's conduct individually to assess the plausibility of Mitchell's claims.

### A. Deliberate Indifference

"It is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs." *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). We use a two-part inquiry to determine whether a defendant was deliberately indifferent. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). First, Mitchell must allege that Jovon suffered from an objectively serious medical need, meaning a medical need that was "diagnosed by a physician as requiring treatment" or that was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jackson*, 756 F.3d at 1065 (citation modified). Here, no physician diagnosed Jovon with a serious condition until he was transferred to a hospital. Therefore, for this first inquiry, we evaluate whether Jovon's medical need was so obvious that even a layperson would have easily recognized the necessity for a doctor's attention.

Second, Mitchell must allege that each particular defendant "actually knew of but deliberately disregarded [this] serious medical need." *Jackson*, 756 F.3d at 1065. A defendant's actual knowledge may be inferred "from the very fact that the risk was obvious." *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481-82 (8th Cir. 2008). Deliberate indifference may be demonstrated "by prison doctors who fail to respond to [a] prisoner's serious medical needs," *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). It can also be demonstrated through "[g]rossly incompetent or inadequate care" where "the treatment is so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Id.* 1240-41. "Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." *Id.* at 1239. Instead, deliberate indifference "requires a mental state akin to criminal recklessness." *Jackson*, 756 F.3d at 1065 (citation modified).

We therefore assess whether Mitchell sufficiently pleaded that (1) Jovon exhibited an objectively serious medical need and (2) each defendant actually knew of but deliberately disregarded this need.

### 1. *Jovon's Serious Medical Need*

By Nurse Heitman's 4:15 a.m. emergency visit on December 25, Jovon's medical need was so obvious that even a layperson would have easily recognized the necessity for a doctor's attention.[2] By then, Jovon was already experiencing the "worst headache of his life," nausea, vomiting, dizziness, difficulty standing, an inability to walk, an inability to eat, and slurred speech. In *Troupe*, we determined that similar symptoms amounted to a serious medical need. 143 F.4th 969-70. The symptoms in *Troupe* included: "frequent vomiting, hearing loss, dizziness, a decreased level of physical activity, difficulty walking, need for a wheelchair,

---

[2]We need not assess whether Jovon had an objectively serious medical need before Nurse Heitman's visit. The only defendants who Mitchell alleges to have known of Jovon's medical need before then were John Does 1-2 and PA Parker. But Mitchell has not plausibly pleaded that they actually knew of and deliberately disregarded Jovon's medical need. *See infra* Sections II(A)(2)(iv)-(v).

extreme weakness rendering him nearly bedridden, headaches, and visible weight loss." *Id.* Aside from "hearing loss" and "visible weight loss," Jovon was experiencing all of these symptoms by Nurse Heitman's visit. Jovon also had slurred speech, which Mitchell alleges is a "classic indication of a stroke."

Defendants request that we look to *Jones*, where we determined that Jones, an inmate with symptoms similar to Jovon's, did not have a serious medical need. *See* 512 F.3d at 482-83. Defendants are correct that Jones's symptoms were comparable to, if not outwardly more severe than, Jovon's. Jones was "unable to stand or walk under her own power, was 'google-eyed' and unresponsive, was rolling on the ground while grunting and groaning, was bleeding from the mouth, smelled as if she had urinated on herself, and was breathing at a very rapid rate." *Id.* at 482.

Nonetheless, Jovon's case is closer to *Troupe* than to *Jones*. "[P]rison officials' background knowledge is part of the analysis" as to whether "a medical need is sufficiently obvious." *Id.*; *see Troupe*, 143 F.4th at 970. And importantly in *Jones*, "the prison officials had no background knowledge that made it obvious that [Jones's] symptoms required medical attention." *Jones*, 512 F.3d at 483. She had a history of behavioral and psychological troubles and had been labeled as a "difficult inmate." *Id.* Further, she "never expressed a need for medical attention" while exhibiting the at-issue symptoms. *Id.* at 481, 483. But here, as in *Troupe*, the allegations "establish that [jail officials] had sufficient background knowledge to recognize the objective seriousness of [the medical] condition." *See* 143 F.4th at 970. Jovon was a cooperative and compliant detainee. He pleaded during the 4:15 a.m. visit to be taken to the infirmary. And the fact that Jovon was an otherwise-healthy 31-year-old might have been a reason for greater, not less, alarm. Mitchell plausibly pleaded that Jovon had a serious medical need on December 25, 2019.

We now turn to whether Mitchell plausibly pleaded that individual defendants actually knew of and deliberately disregarded Jovon's serious medical need.[3]

## 2.  *Defendants' Actual Knowledge and Deliberate Disregard*

### (i)  Nurse Heitman

Mitchell plausibly pleaded that Nurse Heitman actually knew of and deliberately disregarded Jovon's serious medical need.  Nurse Heitman recorded nearly all of Jovon's symptoms, including: a bad headache, throbbing in the forehead, nausea, vomiting, difficulty standing, and complaints of an inability to eat.  Defendants' suggestion that Heitman observed only a subset of Jovon's symptoms is unpersuasive.  Although Nurse Heitman did not record Jovon's slurred speech, Mitchell alleges that a correctional officer present during the visit has reported that Jovon's speech was slurred.  As alleged, then, Nurse Heitman presumably would have observed this symptom.  Further, although Nurse Heitman did not record Jovon's inability to walk, she did record his difficulty standing.  And finally, although Nurse Heitman did not record that Jovon had "the worst headache of his life," she did record that he had a "bad headache" and "throbbing in the forehead." Taken together with her record of Jovon's other symptoms, this discrepancy is negligible.

It is also plausible that Nurse Heitman deliberately disregarded Jovon's serious medical need.  During the 4:15 a.m. visit, Nurse Heitman treated Jovon only by giving him a Tylenol.  A jury could find that this treatment was so inappropriate as to evidence a refusal to provide essential care.  *See Dulany*, 132 F.3d at 1240-41.  Defendants counter that Nurse Heitman's treatment was, at most, negligence or medical malpractice.  But Nurse Heitman's treatment—giving a Tylenol to a patient

---

[3]Defendants also argue that Mitchell must "place verifying evidence in the records to establish the detrimental effect of delay in medical treatment."  But Defendants cite cases dealing with summary judgment, not motions to dismiss. Mitchell plausibly pleaded the detrimental effect of delay in Jovon's treatment.

who could barely stand or speak—bordered on no treatment at all. To accept Defendants' argument as a basis for dismissal would, effectively, imply that a medical professional who provides *any* treatment cannot be deliberately indifferent. Our precedent says otherwise. *See Dantzler v. Baldwin*, 133 F.4th 833, 847 (8th Cir. 2025) ("Mere proof of medical care is insufficient to disprove deliberate indifference.") (citation modified).

Further, when Jovon or his cellmate called for Nurse Heitman again at 6:00 a.m., she declined to visit their cell and instead said that Jovon would need to wait until a different nurse was available. That nurse, Nurse Reynolds, would not see Jovon until over an hour later. This delay plausibly constituted a "refusal to provide essential care." *See Dulany*, 132 F.3d at 1240-41.

### (ii)  Nurse Reynolds

Mitchell plausibly pleaded that Nurse Reynolds actually knew of Jovon's serious medical need. During the 7:15 a.m. visit, she noted that Jovon's symptoms included a serious headache, vomiting, and a "very dry mouth," and that Jovon felt he was going to pass out. Nurse Reynolds's report, to be sure, did not identify quite as many, or as severe, symptoms as Nurse Heitman's report from the 4:15 a.m. visit had identified. But it is reasonable to infer from Mitchell's alleged facts that Nurse Reynolds still saw Jovon exhibiting symptoms comparable to those which had constituted a serious medical need in *Troupe*, 143 F.4th at 969-70. Notably, other detainees had to carry Jovon to visit Nurse Reynolds because he could not walk or stand. Nurse Reynolds would have seen Jovon in this condition, and thus, it is plausible that she was aware of his serious medical need. It is therefore also plausible that she deliberately disregarded Jovon's serious medical need when she failed to respond to it and instead returned him to his cell.

### (iii)  Nurse Howard

Likewise, Mitchell plausibly pleaded that Nurse Howard actually knew of Jovon's serious medical need.  Nurse Howard recorded that Jovon was experiencing a throbbing headache, vomiting, slurred speech, a dry tongue and lips, and dehydration.  It is reasonable to infer that she also saw that Jovon was unable to walk, as he was taken to visit her in a wheelchair.  Nurse Howard therefore observed nearly all the same symptoms that Nurse Heitman did, except for Mitchell's inability to eat.  This discrepancy is negligible, particularly as Nurse Howard noted Jovon's vomiting.

It is also plausible that Nurse Howard deliberately disregarded Jovon's serious medical need.  Defendants point out that Nurse Howard gave *some* treatment to Jovon.  Nurse Howard contacted PA Parker, administered blood pressure tests as PA Parker recommended, and gave Jovon a cup of water.  But that was all.  The blood pressure tests were solely diagnostic; they could not have resolved Jovon's symptoms or underlying medical problems.  And given the apparent urgency of Jovon's condition, Nurse Howard's decision to otherwise treat Jovon only by giving him a cup of water plausibly evidenced a refusal to provide essential care.  *See Dulany*, 132 F.3d at 1240-41.  Regardless of whether Nurse Howard followed PA Parker's instructions when treating Jovon, Nurse Howard plausibly had a basis to conclude that those instructions "were so ineffective that following them might raise the specter of liability for deliberate indifference . . . ."  *See Rusness v. Becker Cnty.*, 31 F.4th 606, 617 (8th Cir. 2022).

### (iv)  PA Parker

Mitchell has not plausibly pleaded that PA Parker was deliberately indifferent to Jovon's serious medical need.  Unlike the defendant nurses, PA Parker did not witness Jovon's symptoms firsthand.  Instead, PA Parker based his orders on what he heard of Jovon's symptoms from the nurses.  Mitchell does not allege that PA

-11-

Parker had sufficient information to have had actual knowledge of and to have deliberately disregarded Jovon's need.

Around 1:30 p.m. on December 24, a nurse informed PA Parker that Jovon had been vomiting since the day prior, was nauseous, and was dizzy. PA Parker did not deliberately disregard Jovon's reported condition. Instead, PA Parker prescribed medication and instructed the nurses to monitor Jovon's condition and to alert him if Jovon had any new complaints.

As alleged, PA Parker did not learn of Jovon's additional symptoms at least until mid-morning on December 25. During the evening of December 24, a nurse notified PA Parker only that Jovon was continuing to vomit. Nurse Reynolds "contacted" PA Parker after her 7:15 a.m. visit with Jovon on December 25, but there is no indication of what she told him. Nor is there any allegation that Parker ordered Jovon to be returned to his cell, as Mitchell's opening brief implies. When Nurse Reynolds contacted PA Parker again later that morning, PA Parker ordered that Jovon be sent to the infirmary. PA Parker's conduct that morning therefore did not evidence a refusal to provide essential care. *See Dulany*, 132 F.3d at 1240-41.

When Jovon visited Nurse Howard in the infirmary, Nurse Howard reported to PA Parker that Jovon had a throbbing headache, vomiting, slurred speech, dry lips and tongue, and dehydration. PA Parker responded by ordering Nurse Howard to administer blood pressure tests and suggesting that she provide intravenous fluids to Jovon if he could not drink enough water. Again, PA Parker's conduct did not evidence a refusal to provide essential care. Instead, PA Parker attempted to treat the symptoms he knew Jovon had. To illustrate, PA Parker, as alleged, was unaware that Jovon could not walk—contrary to Mitchell's briefing, the complaint never alleges that nurses informed PA Parker about this symptom—but PA Parker had stated that Jovon might need to go to the hospital if he had difficulty walking. Further, although PA Parker did not "follow-up" on Jovon's treatment, this failure was not deliberate disregard of Jovon's serious medical need. PA Parker could have assumed that the nurses would notify him of any important updates.

### (v)  John Does 1-2

Mitchell has not plausibly pleaded that John Does 1-2 actually knew of and deliberately disregarded Jovon's serious medical need.  Mitchell alleges that John Does 1-2 are correctional officers who did not make Jovon stand up for a health check on December 24.  These allegations are similar to the allegations against a correctional officer in *Troupe*.  That officer had, similarly, not required a detainee to stand at a nightly health check.  143 F.4th at 971.  But we determined that the correctional officer's conduct, though perhaps "gross negligence," did not amount to "reckless disregard," because the detainee had not been "unconscious at that point or otherwise unresponsive."  *Id*.  That reasoning applies here.  Mitchell has not alleged that Jovon was unconscious or otherwise unresponsive when John Does 1-2 conducted the counts.

### (vi)  John Does 3-4

Mitchell has not plausibly pleaded that John Does 3-4 actually knew of and deliberately disregarded Jovon's serious medical need.  Mitchell alleges that John Does 3-4 are correctional officers who accompanied Nurse Heitman to Jovon's cell for the 4:15 a.m. visit.  Mitchell, however, offers no other allegation describing their involvement in—or presence at—the visit, or their observation of Jovon's symptoms.  Although Mitchell alleges that "a correctional officer who was present" during the visit stated that Jovon had slurred speech and pleaded to be transferred to the infirmary, Mitchell does not state whether that correctional officer was John Doe 3, John Doe 4, or someone else.  Mitchell, therefore, has not plausibly pleaded that John Does 3-4 were deliberately indifferent.[4]

---

[4]Defendants raise qualified immunity as an independent reason to reject Mitchell's deliberate indifference claims.  We have elsewhere determined, however, that officials "are not entitled to qualified immunity at the pleadings stage" where a plaintiff has plausibly pleaded a claim of deliberate indifference.  *See Troupe*, 143 F.4th at 971.

-13-

## B. Failure to Train

Mitchell alleges claims against St. Louis County and several of its employees for a failure to train the jail staff. We assess these claims separately.

### 1. *Claims Against the County Employees*

To state a § 1983 claim against a supervisor for a failure to train, Mitchell must first allege that the supervisor's subordinate committed a constitutional violation. *Schoettle v. Jefferson Cnty.*, 788 F.3d 855, 861-62 (8th Cir. 2015). Mitchell must then allege that the supervisor "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury" to Jovon. *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012) (citation modified); *accord Davis v. Buchanan Cnty.*, 11 F.4th 604, 624-25 (8th Cir. 2021). To establish that a supervisor was deliberately indifferent to or tacitly authorized the unconstitutional acts, Mitchell must allege that the supervisor "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Livers*, 700 F.3d at 356. Below, we assess whether Mitchell's claims against Dr. Doucette and John Does 5-6 satisfy this test.

#### (i) Dr. Doucette

Mitchell satisfies the threshold step for his failure-to-train claim because he plausibly pleaded that Dr. Doucette's subordinates committed a constitutional violation. Dr. Doucette supervised the medical staff, and Mitchell plausibly pleaded that at least some of the medical staff were deliberately indifferent to Jovon's serious medical need.

However, Mitchell has not plausibly pleaded that Dr. Doucette had notice of a pattern of unconstitutional acts committed by her subordinates. *See Livers*, 700 F.3d at 355. Mitchell alleges that Dr. Doucette was aware of systemic problems in

how the medical staff administered medical care.[5]  But Mitchell does not allege how these problems amounted to a pattern of violations of "a clearly established constitutional right."  *See Davis*, 11 F.4th at 624.  Presumably, Mitchell is alleging that these problems were a pattern of deliberate indifference—Mitchell offers no other constitutional theory, and he alleges that the medical staff were deliberately indifferent to Jovon's medical need.  But to allege a pattern of deliberate indifference, Mitchell must allege a pattern where staff actually knew of and deliberately disregarded detainees' serious medical needs.  *See Dulany*, 132 F.3d at 1239; *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) ("Medical malpractice alone . . . is not actionable under the Eighth Amendment."); *see also Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018) ("[A] single incident cannot serve as notice for a pattern of misconduct.").  Mitchell does not do this.  We therefore need not analyze the other elements of this failure-to-train claim.

We also need not address Mitchell's supporting allegation that Dr. Doucette violated Mo. Ann. Stat. § 334.104.  That statute, which Defendants argue is inapplicable here, imposes certain supervisory requirements on physicians who are engaged in collaborative practice arrangements with nurses.  Even if applicable, that statute would not affect our analysis of Mitchell's failure-to-train claim—the only claim against Dr. Doucette on appeal—because Dr. Doucette lacked notice of a pattern of unconstitutional conduct by her subordinates.

Mitchell points out that we allowed a similar failure-to-train claim against Dr. Doucette in *Troupe*.  143 F.4th at 972-73.  There, we reasoned that Dr. Doucette was aware of conduct "evidencing deliberate indifference" because she was aware that "nursing staff . . . regularly violated standing orders to take vital signs" and that there

---

[5]For example, Dr. Doucette knew that nurses' "frequent and improper diagnoses of malingering" caused nursing delays or inaction.  She knew that these improper diagnoses were a "systemic problem" which had resulted in previous detainee injuries and deaths.  She also knew that medical staff did not enforce her standing orders and that this led to the death of other patients.  And she knew that medical staff frequently did not take patients' vital signs in violation of jail policy.

were "other systemic medical issues in the facility that led to jail deaths." *Id.* at 972. But *Troupe* does not exempt Mitchell from the requirement of alleging—with enough factual matter—that Dr. Doucette had notice of a pattern of unconstitutional acts by her subordinates. In *Troupe*, the bare allegation that nurses had disregarded standing orders could not have—on its own—showed a pattern of deliberate indifference.[6] And *Troupe* did not specify which "other systemic medical issues" made such a pattern plausible. We need not extrapolate which systemic issues were dispositive. *See Streu v. Dormire*, 557 F.3d 960, 964 (8th Cir. 2009) ("[W]e are generally not bound by a prior panel's implicit resolution of an issue that was neither raised by the parties nor discussed by the panel."). It is enough to say that Mitchell does not allege them here.

(ii)  John Does 5-6

Mitchell alleges that John Does 5-6 failed to train the medical staff.[7] These claims fail for the same reason that Mitchell's claims against Dr. Doucette do: Mitchell has not plausibly pleaded that John Does 5-6 had notice of a pattern of unconstitutional conduct.

We can also dismiss these claims because Mitchell's allegations against John Does 5-6 are not "specific enough to permit [their identities] to be ascertained after reasonable discovery," *Est. of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995), as is required for these defendants to be unnamed. *See also Munz v.*

---

[6]Mitchell, citing two cases from the Fifth Circuit, argues that deliberate indifference "can be inferred from nurses who know of but disregard standing orders." But even assuming that this proposition can be true, it can only be so where the standing orders are related to a patient's treatment and where the patient has an objectively serious medical need.

[7]For example, John Does 5-6 knew that improper reporting of malingering was a systemic problem that resulted in previous injuries and deaths, tacitly endorsed these improper nursing judgments, never did anything to fix this problem, and failed to ensure the functionality of certain medical equipment.

*Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985) (looking for "specifics" in a complaint that make an unnamed defendant "capable of being identified").

## 2. *Claim Against St. Louis County*

A municipality can be liable under 42 U.S.C. § 1983 for a failure to train or supervise its employees where: (1) the municipality's training practices are inadequate; (2) the municipality was deliberately indifferent to the rights of others in adopting those practices such that the failure to train reflects a deliberate or conscious choice by the municipality; and (3) an alleged deficiency in the municipality's training practices actually caused the plaintiff's constitutional deprivation. *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1061 (8th Cir. 2013). To be deliberately indifferent, a municipality must have "notice that its procedures were inadequate and likely to result in a constitutional violation." *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996).

Mitchell alleges that several of St. Louis County's training practices are inadequate, including its failures to correct nurses' erroneous diagnoses of malingering, to ensure nurses adhered to standing orders, and to ensure that correctional officers required detainees to stand up for health checks. It is plausible that St. Louis County had notice its practices were inadequate and likely to result in a violation of constitutional rights. Mitchell alleges that the County "knew all of the above problems were occurring frequently at the jail" and "refused to supervise and discipline to correct these problems." Mitchell also alleges that these practices previously led to another detainee's death and that there was intense media and political scrutiny of the jail's medical operations. And finally, it is plausible that these inadequate training practices caused the jail staff to be deliberately indifferent to Jovon's serious medical need. If the staff were better trained, they might have escalated Jovon's medical care before his condition deteriorated.

### C. Unconstitutional Policy, Practice, or Custom

A municipality can also be liable under § 1983 for a constitutional violation resulting from an official municipal policy or an unofficial custom. *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (citation modified). Mitchell alleges that St. Louis County maintained a number of "inadequate policies, procedures, custom[s], practices and actions."

Policy and custom, however, "are not the same thing." *Corwin*, 829 F.3d at 699-700. To allege a § 1983 claim against St. Louis County that is based on an official policy, Mitchell must identify "'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the County's] officers.'" *See Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013) (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690-91 (1978)). Mitchell offers no indication, however, which—if any—of the County's alleged "policies, procedures, custom[s], practices and actions" were officially adopted and promulgated by county officers. Mitchell's sweeping allegation that "St. Louis County enacted inadequate policies" is a "bare assertion" that amounts to "nothing more than a formulaic recitation of the elements" that cannot support a plausible claim. *See Iqbal*, 556 U.S at 681.

Therefore, to sustain this claim, Mitchell must allege sufficient facts to show an unofficial custom. Mitchell must allege: (1) "The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by [St. Louis County's] employees"; (2) "Deliberate indifference to or tacit authorization of such conduct by [the County's] policymaking officials after notice to the officials of that misconduct"; and (3) "That [Jovon] was injured by acts pursuant to [the County's] custom." *See Troupe*, 143 F.4th at 973; *Johnson*, 725 F.3d at 828.

Mitchell has not "assert[ed] specific instances or provide[d] specific examples . . . that could support an inference of an unconstitutional policy or custom." *See Watkins v. City of St. Louis*, 102 F.4th 947, 954 (8th Cir. 2024). Mitchell has not

alleged facts that show that earlier instances of inadequate medical care constituted a pattern of deliberate indifference.  Nor has Mitchell explained how the alleged facts could constitute a pattern of a different constitutional violation.

## III.  Conclusion

Accordingly, we reverse the district court's dismissal of the deliberate indifference claims against Nurse Heitman, Nurse Reynolds, and Nurse Howard and of the failure-to-train claim against St. Louis County.  Because these federal claims remain in the case, we also instruct the district court to exercise supplemental jurisdiction over Mitchell's state law claims.  *See Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 925 (8th Cir. 2000).[8]  We otherwise affirm.

The case is remanded for proceedings consistent with this opinion.

_____

---

[8]If the district court grants summary judgment to Defendants on these remaining federal claims, it need not continue to exercise supplemental jurisdiction over the state law claims.  *See, e.g., Thompson v. Kanabec Cnty.*, 958 F.3d 698, 708-09 (8th Cir. 2020).